70 F.3d 1290
 38 U.S.P.Q.2d 1150
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
MONEY STATION, INC., Appellant,
v.
CASH STATION, INC., Appellee.
 No. 95-1240.
 United States Court of Appeals, Federal Circuit.
 Nov. 27, 1995.
 
 Before MAYER, Circuit Judge, SKELTON, Senior Circuit Judge, and BRYSON, Circuit Judge.
 DECISION
 SKELTON, Senior Circuit Judge.
 
 
 1
 Applicant Money Station, Inc., appeals a decision of the Trademark Trial and Appeal Board (board), of the United States Department of Commerce Patent and Trademark Office, dated December 7, 1994, denying applicant's application No. 73/832,450 to register the mark MONEY STATION and design, and sustaining opposition No. 82704 filed by opposer Cash Station, Inc., a nonprofit corporation, whose two registered marks CASH STATION predated the filing of the application to register the mark of the applicant. The denial was based on a finding by the board that applicant's mark so resembled opposer's mark as to be likely to cause confusion, or to cause mistake, or to deceive. We affirm.
 
 DISCUSSION
 
 2
 Applicant filed application No. 73/832,450 on October 19, 1989, to register the mark MONEY STATION and design (MONEY disclaimed), with a claimed date of first use in April 1984. The mark was to be used in connection with "electronic funds transfer and commercial and consumer banking automated teller machine (ATM) and point of sale terminal services". The mark and design were as shown below:
 
 
 3
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 4
 The registration of this mark and design was opposed by opposer Cash Station, Inc., under the provisions of 15 U.S.C. 1052(d) on the ground that it so resembled the registered mark CASH STATION previously used by opposer for electronic banking services, automatic teller machine and point of sale services as to likely cause confusion, or mistake, or to deceive. Opposer was the owner of two registered marks of CASH STATION. One was registered on January 26, 1982, on an application filed April 28, 1980, claiming first use on March 21, 1980, and being as follows:
 
 
 5
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 6
 Opposer's second registration of its mark of CASH STATION was effected on March 8, 1983, on an application filed July 27, 1981, claiming first use on March 14, 1980. This mark was slightly different in design and appearance as shown below:
 
 
 7
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 8
 The services offered by both parties under their marks (issued and applied for) are similar and for all practical purposes are the same. This is shown by the evidence and also by the following statement of facts in applicant's brief before the board, and which is quoted with approval by the board:
 
 
 9
 The services covered by the application at issue are "electronic funds transfer in commercial and consumer banking and automated teller machine (ATM) and point-of-sale terminal services." As correctly indicated by Opposer, these services are essentially shared ATM network services that link ATM machines of various financial institutions, such as banks, savings and loans, and credit unions. By linking ATM machines of various banks together, a user is able to access his/her account in his/her financial institution from ATM machines of other financial institutions. In other words, a user can transact business at his/her financial institution remotely from the location of an ATM of another financial institution. Typical ATM transactions include deposits, withdrawals, transfer of funds and balances inquiries. [citation omitted]
 
 
 10
 Both Applicant and Opposer operate regional electronic funds transfer networks. These regional networks link various local networks with each other and with two national networks, Cirrus and Plus. [citation omitted] Ninety percent (90%) of the ATMs in the country are members of one or both of these two national networks. As a result of this array of linkage, ATM customers of a particular financial institution that is a member of the local, regional and national networks can, and often do when traveling, remotely access their accounts from any number of ATMs of other financial institutions located throughout the country. [citation omitted]
 
 
 11
 Applicant ... sells its services only to eleven (11) financial institutions, referred to by Applicant as "direct participants." These direct participants, in turn, sell Applicant's services to approximately five hundred (500) other financial institutions. [citation omitted] Each of the member financial institutions is given the right to issue access cards to its customers, which cards entitle their owners to conduct selective banking transactions at each of the ATMs in the network.
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 ... There are currently approximately 4500 Money Station ATMs located in six states ... In addition, there are approximately 2600 point of sale devices located in those same states.
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 The services offered by Opposer under the CASH STATION mark, which are essentially the same type of services provided by Applicant, are similarly sold to financial institutions in a similar manner ... Like the MONEY STATION network, most of the members of the CASH STATION network are members of either or both of the national networks, Cirrus or Plus. [citation omitted] ...
 
 
 18
 Due to the linking of the networks of Applicant and Opposer, more than eight million (8,000,000) MONEY STATION access cards can be used to access Opposer's CASH STATION ATM's. Similarly, CASH STATION access cards can be used to access MONEY STATION ATMs. [citation omitted]
 
 
 19
 Both parties offer the same teller machine and point of sale services by issuing cards bearing their respective marks with which cardholders may purchase goods or services at outlets having point of sale terminals instead of using cash or credit cards.
 
 
 20
 At the time of trial opposer had 1800 CASH STATION ATM machines and 500 point of sale terminals in Illinois and Indiana. It planned to add another 1000 point of sale terminals in February 1993, in Illinois, Indiana, Wisconsin, Michigan and Missouri. Opposer is a nonprofit corporation that sells its services at cost. The applicant sells its MONEY STATION services to 11 financial institutions who in turn sell them to 500 participating financial institutions in Ohio, Michigan, Indiana, Kentucky, West Virginia and Pennsylvania.
 
 
 21
 The issue in this case is whether the contemporaneous use of the respective marks by the parties in connection with their identical services is likely to cause confusion, or to cause mistake, or to deceive, as provided in 15 U.S.C. 1052(d).
 
 
 22
 The board made various findings of fact from the evidence, including the following. The opposer had priority of use and registration of its mark before applicant filed its application and first used its mark. Also, when applicant first used its mark it knew about opposer's mark and its registration and was therefore the newcomer, although the board found no bad faith. The services furnished by both parties under their respective marks were identical and were sold through the same channels of trade to the same classes of purchasers, both educated and uneducated. The two marks share the same last word and are constructed in the same manner, and are similar in connotation and meaning. Opposer's mark is neither a weak mark nor a strong mark, but is an "in between" mark, and although it is highly suggestive, it has gained a substantial measure of goodwill in the Chicago metropolitan area where opposer's activities are concentrated, which is a factor the board found "weighs in favor of opposer". The marks of the respective parties are different in sound and appearance. There was no evidence of actual confusion during the eight years that both marks were used up to the time of trial. A cardholder of applicant can use the card on any of opposer's ATM machines and a cardholder of opposer can use the card on any of applicant's ATM machines, provided that both the cards and the machines bear the mark of the CIRRUS or PLUS national networks.
 
 
 23
 Finally, the board found that applicant's mark MONEY STATION, so resembles opposer's previously used and registered mark CASH STATION as to be likely to cause confusion, or to cause mistake, or to deceive.
 
 
 24
 The applicant contends on appeal that opposer's mark is a weak mark and that this fact, together with the finding of the board that it is highly suggestive of its ATM services, are circumstances that should allow applicant's mark to be registered. The opposer, on the other hand, argues that its mark is a strong one, and that if there is any doubt about it, the doubt should be resolved against applicant as a newcomer. It has been held that a newcomer, as the applicant here, has both the opportunity and the obligation to avoid confusion, and if he fails to do so by adopting a mark similar to one used by another for the same or closely related goods or services, he does so at his peril, and all doubt on the issue of likelihood of confusion is resolved against him. In re Shell Oil Co., 992 F.2d 1204 (Fed.Cir.1993); Nina Ricci S.A.R.L. v. E.T.F. Enterprises Inc., 889 F.2d 1070 (Fed.Cir.1989); Kimberly-Clark Corp. v. H. Douglas Enterprises, Ltd., 774 F.2d 1144 (Fed.Cir.1985) and Kenner Parker Toys, Inc. v. Rose Art Indus., Inc. 963 F.2d 350 (Fed.Cir.1992), cert. denied 113 S.Ct. 181. That is the situation in this case.
 
 
 25
 If there is any weakness in opposer's mark because it is suggestive or because it is an "in between" mark as found by the board, this has been offset by the outstanding success and goodwill of its mark in the marketplace, particularly in the Chicago area where it has been the dominant mark. Since 1987 sales of opposer's services under its mark have been more than $50,000,000 with more than 350,000,000 transactions. We held in Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565 (Fed.Cir.1983) that "... opposer's marks have acquired considerable fame, which weighs in its favor in determining likelihood of confusion". See also Kimberly-Clark Corp. v. H. Douglas Enterprises, Ltd., supra; Dan Robbins & Associates, Inc. v. Questor Corp., 599 F.2d 1009 (C.C.P.A.1979); and Hunt Foods & Indus., Inc. v. Gerson Stewart Corp., 367 F.2d 431 (C.C.P.A.1966).
 
 
 26
 The applicant argues that the similarity in meaning of the two marks alone is insufficient to support a finding of likelihood of confusion because opposer's mark is a weak mark. There are cases that support this argument. See, for example, Claremont Polychemical Corp. v. Atlantic Powdered Metals, 480 F.2d 877 (C.C.P.A.1973), and Sure-Fit Prods. Co. v. Saltzson Drapery Co., 254 F.2d 158 (C.C.P.A.1958). However, opposer says its mark is a strong one, and that similarity in meaning of the marks alone is sufficient to support a finding of likelihood of confusion. There are court decisions that support opposer's argument. See Kenner Parker Toys, Inc. v. Rose Art Indus., Inc., supra, and Hancock v. American Steel and Wire Co. of New Jersey, 203 F.2d 737 (C.C.P.A.1953). In the instant case, where opposer's mark is found by the board not to be a weak mark, we conclude that the goodwill the mark has created in the area where its activities have been concentrated, along with its tremendous success in the marketplace, support opposer's argument.
 
 
 27
 The applicant contends that its mark should be registered because there is no proof that during the eight years (up to the time of trial) the two marks have been used there has been any actual confusion. It argues that this supports its view that the lack of actual confusion during this long period of time is evidence that there would not be any likelihood of confusion in the future if its mark is registered. However, the board pointed out that most of the activities of the parties occurred in different states and that there has been little, if any, geographic overlapping of such activities. In any event, evidence of actual confusion is not required and is difficult to obtain. The test is not actual confusion but likelihood of confusion. Weiss Associates, Inc. v. HRL Associates, Inc., 902 F.2d 1546 (Fed.Cir.1990).
 
 
 28
 Likelihood of confusion is a question of law which is decided on the facts of each case. On appeal, we review the board's conclusion de novo and its findings of fact for clear error. In re Shell Oil Co., 992 F.2d 1204 (Fed.Cir.1993). In re Application of E.I. DuPont deNemours & Co., 476 F.2d 1357 (C.C.P.A.1973) we listed the following factors for guidance in testing for the likelihood of confusion:
 
 
 29
 (1) The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.
 
 
 30
 (2) The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use.
 
 
 31
 (3) The similarity or dissimilarity of established, likely-to-continue trade channels.
 
 
 32
 (4) The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.
 
 
 33
 (5) The fame of the prior mark (sales advertising, length of use).
 
 
 34
 (6) The number and nature of similar marks in use on similar goods.
 
 
 35
 (7) The nature and extent of any actual confusion.
 
 
 36
 (8) The length of time during and conditions under which there has been concurrent use without evidence of actual confusion.
 
 
 37
 (9) The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark).
 
 
 38
 (10) The market interface between applicant and the owner of a prior mark:
 
 
 39
 (a) a mere "consent" to register or use.
 
 
 40
 (b) agreement provisions designed to preclude confusion, i.e. limitations on continued use of the marks by each party.
 
 
 41
 (c) assignment of mark, application, registration and good will of the related business.
 
 
 42
 (d) laches and estoppel attributable to owner of prior mark and indicative of lack of confusion.
 
 
 43
 (11) The extent to which applicant has a right to exclude others from use of its mark on its goods.
 
 
 44
 (12) The extent of potential confusion, i.e., whether de minimis or substantial.
 
 
 45
 (13) Any other established fact probative of the effect of use.
 
 
 46
 In this case, we have carefully reviewed the board's findings of fact, and we conclude that they are supported by substantial evidence and are not clearly erroneous. We have also considered the above factors relevant to the likelihood of confusion, and we hold that applicant's MONEY STATION, as applied to the services specified in its application, so resembles opposer's previously used and registered mark CASH STATION as to be likely to cause confusion, or to cause mistake, or to deceive.
 
 
 47
 We find no error in the board's decision, and it is affirmed.
 
 
 48
 MAYER, Circuit Judge, dissenting.
 
 
 49
 Likelihood of confusion is a question of law, Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1565, 4 USPQ2d 1793, 1797 (Fed.Cir.1987), based on underlying findings of fact, Olde Tyme Foods, Inc. v. Roundy's, Inc., 961 F.2d 200, 202, 22 USPQ2d 1542, 1544 (Fed.Cir.1992). The board found that the CASH STATION mark, though not "merely descriptive," is "quite suggestive." In light of this finding and the evidence of record, I see no likelihood of confusion.
 
 
 50
 "Highly suggestive" marks are accorded only weak protection. See, e.g., Claremont Polychemical Corp. v. Atlantic Powdered Metals, Inc., 470 F.2d 636, 637, 176 USPQ 207, 207 (CCPA 1972) (DURAGOLD and EVERGOLD "highly suggestive of the color and wearing ability of the products upon which they are employed"). On the other hand, the board has given stronger protection to "somewhat suggestive" marks. See, e.g., Andrew Jergens Co. v. Sween Corp., 229 USPQ 394, 396 (TTAB 1986) (GENTLE TOUCH for soap and personal hygiene products "somewhat suggestive").
 
 
 51
 Although the board referred to the CASH STATION mark as an "in between" mark, its use of the term "quite" indicates that it viewed the mark as closer to the weak end of the spectrum. See Webster's Third New International Dictionary 1867 (unabridged ed., 1971) (defining "quite" as "to a considerable extent"). Ultimately, the precise label used to describe the mark does not make much difference, because "[t]hese categories, like the tones in a spectrum, tend to blur at the edges and merge together." Zatarains, Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 790, 217 USPQ 988, 993 (5th Cir.1983). Nevertheless, given that the mark is closer to the "highly suggestive" end of the spectrum than the arbitrary or fanciful, I cannot agree with the board's holding that there is a likelihood of confusion when Money Station uses its mark. The last words of both marks are identical, and their meanings are essentially the same, but the first words--Money and Cash--are sufficiently distinct in sound and appearance that the marks, when viewed as a whole, would not be likely to cause confusion. I would reverse.